## HARRY WINER v. CHATTANOOGA FEED CO., et al.

Eastern Section.   April 9, 1927.

Petition for Certiorari denied by Supreme Court, June 11, 1927.

1. **Partnership. In the settlement of a partnership, the value of the good will of the firm is a fact to be ascertained from the evidence.**

   In an action to settle the affairs of a partnership held that value of the good will of the partnership was a matter properly to be referred to the Master to be found and reported.

2. **Appeal and error. A Master's report confirmed by the Chancellor has the effect of a verdict by a jury.**

   Where a Master's report is confirmed by the Chancellor on exceptions as to fact such concurrence has the force and effect of the verdict of a jury and is conclusive on the appellate court.

3. **Appeal and error. Partnership. Evidence. Evidence held sufficient to justify the decree of the Chancellor.**

   In an action to wind up the partnership where there was much conflicting evidence and various interests to settle, all of the evidence being submitted to the Chancellor, held that on appeal his decision appearing just, the decree would not be disturbed by the appellate court.

Appeal from Chancery Court, Hamilton County; Hon. W. B. Garvin, Chancellor.

Affirmed.

F. S. Carden and Fleming & Shepherd, of Chattanooga, for appellant.

Whitaker & Foust, of Chattanooga, for appellee.

SNODGRASS, J.   This is the second time in this protracted litigation that this cause has reached this court, having gone through this to the Supreme Court, in which the principal questions were settled and the basis of a reference fixed; and having been remanded and an account taken, it is back here again upon questions made on the report and one other question arising under the supplemental bill, and apparently reserved when the original matters were determined.

It is a bill in effect to wind up a partnership and distribute its assets at least insofar as the complainant is concerned. The original bill was filed in October, 1918 by the complainant, Harry Winer,

against his former partner, G. B. Glenn, Sallie Glenn and Mrs. A. J. Glenn, who, with the complainant, had been partners, conducting a jobbing or feed business under the firm name and style of Chattanooga Feed Company. It appears that Mr. G. B. Glenn was the financial Sampson of the concern, and that complainant had been a former employee, who, no doubt, as the later developments have shown, was an active and efficient man, destined to outrival Mr. Glenn in business capacity and acumen, barring a liability to go upon the rocks as the result of a speculative propensity of no minor ambition. Mr. Glenn it seems was the owner of the building in which the business was conducted, and the other members of the firm, aside from the complainant, were women relatives of his. Apparently the business had prospered under conservative management. It started about the year 1901, when the complainant as a boy was enployed by the concern in some minor capacity and at a small salary. This gradually increased as his efficiency increased, until he was allowed an interest in the concern as well as having his salary increased to quite important proportions.

The original bill alleged that, beginning with the fiscal year, from August 1, 1914 to August 1, 1915 the Chattanooga Feed Company was a partnership, owned and controlled by the defendants and complainant, whose interests therein were alleged to be in the following proportions: G. B. Glenn, 56.0121%; Mrs. A. J. Glenn, 15.1458%; Harry Winer, 21.6316%; Mrs. Sallie Glenn, 7.2105%. It further alleged that the investment for that fiscal year representing the stock and all of the assets of the business was $149,754.50. It then went on to show how under the management of the complainant the concern had made money down through 1915-16, 1916-17, during which latter year complainant's interest had increased to an equality with that of G. B. Glenn, and that for said year under complainant's management the net profits on investment of $160,437.39 were 69.29%, and that the indebtedness had decreased $51,057.29. It was then averred that in the fall of 1917, after much deliberation, complainant decided that he could further his interests by withdrawing from the firm and engaging in business in his own behalf. G. B. Glenn was notified of this purpose, negotiations followed, and instead of his withdrawing from the firm it resulted in a written agreement being entered into whereby complainant purchased the interest of the said G. B. Glenn, to take effect upon the close of business December 31, 1917, invoice to be taken at that time, and upon the basis of the actual market value of the stock of merchandise and fixtures, classified as store fixtures, and the accounts to be appraised at their value also on December 31, 1917, and such accounts as proved worthless after January 1, 1918 were to be charged back to the former partners at interest according to their priority of investment dur-

ing the period in which the accounts were contracted. The rate of settlement was $1 for every $1 of credit valuation of actual physical property. Good will was specifically included, and the rate of interest was to be the current banking rates, not to exceed 7%. Interest was to be paid annually upon completion of the fiscal year. G. B. Glenn was to leave all his present investment intact, subject to call, however, in reasonable installments to meet his personal obligations as they might mature from time to time, or for the purpose of making additional investments, in sums not exceeding $5,000 at any one time nor oftener than within three months of each call, upon thirty days advance notice. There were other provisions of the contract not necessary to be stated here. It was also averred that it was the desire of the complainant to take over the interest of the other partners, but they did not want to sell, and the partnership was then continued until its termination a short time later, and as will hereafter appear.

What seems to have wrecked the smooth sailing under the ambitious hopes of the complainant was his purchase of 13,534 sacks—1,863,833 pounds, or 31,063.60 bushels of cowpeas, which had accumulated since January 1, 1918 to June 30, 1918, and being that much more than they had been able to sell, though during the season it was alleged they had sold 25,000 bushels at a profit. The waning of the season and decline in the price of the peas represented a loss to the firm, as represented in the bill, of $55,157.15, and it was averred that pursuant to his desire not to allow any of his associates in said business to suffer any losses on account of said investment in the peas, and regardless of the question of legal liability, and with the full expectation of having the right to remain and in charge of the business so that he might recoup the losses, that complainant on or about the 30th day of June, 1918 credited said losses with $32,138.24, representing, it was averred, as he figured it, complainant's cash interest in the assets of said Chattanooga Feed Company in dollars and cents. The bill averred that this left a net loss of $23,018.11, which complainant in balancing the accounts of the said Chattanooga Feed Company charged to himself personally, in the full expectation and purpose of paying the same according to the terms of a proposition he had made to Mr. Glenn, which it was stated Mr. Glenn declined.

Negotiations for an amicable continuation of the business failing, the complainant, figuratively speaking, washed his hands of it on August 1, 1918 and abandoned the same to Mr. Glenn and the other partners, who seem to have taken charge and conducted it at a loss, while the complainant, with practically the effective force of the old company, which he seems to have taken with him, organized and began a competitive business, which it seems gradually absorbed the business of the old company, no doubt because of the peculiar ac-

6 T. A.—27.

quaintance and detail advantage which he and his force had personally acquired in his long connection therewith as its practical manager. In October, however, he filed the bill in this cause, alleging that he had been forced out of the business, seeking to be relieved against, to reopen the settlement that he himself had made with the firm, and also seeking an accounting of the firm assets, with an individual adjustment between himself and Glenn. It was sought to have a receiver appointed to take charge of the peas, which had been put in cold storage with various firms, and to have them sold or disposed of, and, after paying the expenses, he asked a credit in proportion to what his interest was when the loss occurred.

Answers and cross-bills were filed, and supplemental bill was brought forward claiming a violation of the contract which had been entered into as to a joint management and disposition of the peas in lieu of the appointment of a receiver which had been applied for. This supplemental bill averred losses aggregating some $1,449.28, and it was insisted that these losses should be charged to G. B. Glenn under the following clause in the contract just referred to:

"All of said peas above described, wherever located, shall be jointly handled and sold by the said G. B. Glenn and Harry Winer at such times and for such prices as they may agree upon. It is expressly agreed by and between the parties hereto that neither the said G. B. Glenn nor the said Harry Winer shall without the consent or approval of the other, sell, dispose of, remove from present storage, or handle any part of said peas at any time, or agree to sell the same. But it is agreed that if an offer is received for any part or all of said peas which either party is willing to accept, but which the other party declined to accept, the party desiring to accept such offer may, at his option exercised at the time, charge the amount of peas, for which offer is made, to the other party at the price offered. Then said amount of peas shall be salable at such times and prices as the party to whom they are charged may determine, and when so sold any loss thereon, plus the carrying charges and interest, shall be borne by, or any gain thereon, belong to said party less the carrying charges and interest on the amount offered from date of such offer. All agreements or disagreements as to sales shall be in writing.

"It is further agreed by the said G. B. Glenn that he now has on hand, stored at the Chattanooga Feed Company, five and a half cars, and the said Harry Winer has five and a half cars of said peas, which they agreed to hold as warehousemen, subject to all the provisions of this contract.

"II. The said peas, or any part thereof, shall be sold by the joint action and agreement of the parties hereto as above set out, the amount thus realized shall be disposed of as follows:

"1.   There shall be paid the cost and expense of carrying, storing, handling and disposing of said peas, without prejudice, to the parties hereto on the question of liability for such charges.

"2.   There shall be paid to the Chattanooga Feed Company a sum equal to one dollar and one-half ($1.50) per bushel on the amount of peas so placed in storage, except about 700 bushels of white peas, in which there shall be paid two dollars and one-half ($2.50) per bushel.

"3.   The .balance of the proceeds of the sale of said peas shall be deposited by the parties hereto in the Hamilton Trust and Saving Bank under an agreement that said bank shall hold said fund intact. at the best rate of interest, which can be secured thereon until all matters in dispute as to the extent of ownership of all the parties in and to said peas and to the fund realized therefrom has been decided either by agreement of parties or by decree of court and the same shall then be paid by the Hamilton Trust and Savings Bank, together with interest  thereon to the party to whom same is so determined to belong.''

It was claimed that certain sales were made without the sanction of complainant, resulting in these losses, which under the contract should  be charged to the defendant Glenn; whereas in answer to this it was claimed that a specific authority was had therefor.

The cause was gotten at issue, proof taken and came on to be heard before the Chancellor, who by his decree settled most of the issues and referred it to the Master for a report.  Petition to rehear was filed and overruled.  An appeal was allowed and the cause taken to the Court of Appeals, and from that court to the Supreme Court, where the decree of the Chancellor was modified and the cause remanded for a report under the modifying instructions.  The cause came again before the Chancellor, the matter was again referred to the Master in part under the following order, inserted here also for its historical reference:

"The order of reference made by this court as modified by the Court of Civil Appeals and affirmed by the Supreme Court is revived.  The Master will consider proof already on file, including report of C. S. Peterson, public accountant and auditor, which has heretofore been filed by agreement of parties, and also such additional proof as may be produced by either party.''

The report of the Master, embodied in the final decree itself, sets out the specific references which were the results of the prior adjudications, leaving off the references to the evidence, is as follows:

"Pursuant to a decree of said court made in the above styled cause at a former term, and directing the Master to hear proof and report on the following items,—

"First. Take and state an account of the partnership transactions up to August 1, 1918, showing the assets and liabilities of the firm on that date, which shall include a true statement of the account of Harry Winer, with the firm and with other partners. In the accounting however, the other partners having taken over the assets will be charged with the value of the same, and credited with the firm liabilities which they have paid, or assumed and in the case of merchandise, fixtures and other tangible assets, but not including the peas, the value will be their market value at the time they were taken over, and in the case of accounts they will be valued at what was collected upon them or could have been collected by the exercise of reasonable diligence and if any of the accounts appearing on the books as assets August 1st, were false accounts or were worthless or uncollectible, they will not be charged to the Glenns, as assets whether made before or after January 1, 1918.

"1—a. He will take and state an account of the peas which will show the net proceeds therefrom, when the peas were sold, it being understood that Winer and Miss Sallie Glenn, and Mrs. A. J. Glenn shall participate in the proceeds of the sale of the peas in proportion to their respective interests in the partnership and the Master will credit the account of Harry Winer, with his share of said net proceeds.

"Second. He will take and state the account between Harry Winer and G. B. Glenn, with respect to his purchase of the Glenn interest under his contract of December 8, 1917, effective January 1, 1918, and in said account Harry Winer will be charged and Glenn credited with the value of Glenn's interest upon the basis of the market value of the merchandise, and fixtures from January 1, 1918 and the face value of the accounts. Glenn will be charged and Harry Winer credited with his pro rata part of any account made prior to that date which afterwards proved to be worthless and with any moneys paid by Winer to Glenn, or on his account out of the firm assets or otherwise, but this will not include the rent, paid to Glenn, this being an item of partnership expense. Any moneys paid to Glenn out of the firm assets, and credited to Winer, in his account with Glenn, will be charged to Winer in the partnership account. Glenn will be charged with whatever interest Winer is found to have had in the assets of the partnership, in the accounting between the partnership, and Winer will be credited in his account with Glenn, for such sum.

"Third. He will fix the value of the good will of the business on August 1, 1918, charging to defendant Winer's part of said good will, but it will be the good will consisting of the use of the old name, and the probability of the old customers, resorting to the old place, and will not include the good will arising from the fact that it was

the Glenns who continued the business and the Master will take into consideration, the fact that Harry Winer took part of the good will with him and entered into a competitive business and had the right to solicit the business of the old customers.

"The undersigned, from the pleadings and proof now· on file, begs leave to report as follows:

"First. The total net value of the partnership of the Chattanooga Feed Company, on July 1, 1918, exclusive of the pea fund, was $57,516.37, and said total assets were owned by the following parties and respective amounts:

| | |
|---|---:|
| "Harry Winer, | $23,733.68 |
| "Mrs. A. J. Glenn, | 25,964.50 |
| "Mrs. Sallie Glenn, | 7,818.19 |

"1-a. By agreement of the parties the net amount from the cowpea fund was deposited with the Hamilton Trust & Savings Bank, the said net amount being $48,084.24. Of this amount there was $44,000 withdrawn, in loans by the complainant, and defendants.

| | | |
|---|---:|---:|
| "The amount so loaned to said parties | $44,000.00 | |
| "Interest on same to January 16, 1926, | 12,068.66 | |
| | | $56,068.66 |
| "The balance was left on deposit in said bank and being | $4,084.24 | |
| "Interest on same to January 16, 1926, | 423.98 | |
| | | 4,508.22 |
| "Total fund and interest to January 16, 1926, | | $60,576.88 |

"By former decrees of the court, it was adjudged that this fund is owned in the following proportions:

| | |
|---|---:|
| "Harry Winer, | 77.6537% |
| "Mrs. A. J. Glenn, | 15.1458% |
| "Mrs. Sallie Glenn, | 7.2105% |

"Wherefore the Master reports the interests in said pea fund are as follows:

| | |
|---|---:|
| "Harry Winer, | $47,034.14 |
| "Mrs. A. J. Glenn, | 9,174.85 |
| "Mrs. Sallie Glenn, | 4,367.89 |

"Second. The net value of the interest sold to Winer by G. B. Glenn as of January 1, 1918, was $68,889.87, and on July 1, 1918 said interest or indebtedness was decreased on account of various transactions between the parties to ......     $44,640.48

"Harry Winer's interest on July 1, 1918 in said partnership exclusive of the pea fund was,     23,733.68

"Which left a balance as of July 1, 1918
   due G. B. Glenn from Harry Winer of,     $20,906.80
"Interest from July 1, 1918, to January
   16, 1926                                   9,460.32
                                            _____
                                            $30,367.12

"Third.   Under this item of reference the complainant and defendant have taken a number of depositions of leading and reputable business men of Chattanooga as to the value of the good will of the Chattanooga Feed Company on July 1, 1918.  .  .  .

"The record discloses the fact that the Chattanooga Feed Co. was one of the oldest, largest and most reputable organizations in Chattanooga in its line of business, having been organized in the year 1890. It further shows that from 1905 up to January 1, 1918 its business for each year has always shown a substantial profit on its investment, running from 17% to 124% per year on the invested capital, and showing profits from $12,000 per year up to $127,000 per year, said company never showing a loss in its operation until the first six months of January, 1918, during which said period Harry Winer owned and operated the said business.

"The Master reports that the good will of said business on July 1, 1918, based on the use of the old name and the probability of the old customers resorting to the old place but not including the good will arising from the fact, that the Glenns were to continue said business and taking into consideration the fact that Harry Winer took part of the good will with him and entered into a competitive business with the right to solicit the business of the old customers, was $10,000.

"He further reports that Harry Winer's interest in said good will as of July 1, 1918, based on his pro rata ownership, as heretofore decreed of 77.6437% on July 1, 1918 was                    $ 7,764.37
"Interest on same to January 16, 1926,                          3,503.37
                                                              _____

   making a total of                                          $11,267.74
"Summary.
"Amount due G. B. Glenn by Harry Winer, $30,367.12
"Amount of Winer's loan with interest,      28,034.33
                                            _____

                                                              $58,401.45
"Amount of Winer's interest in pea fund, $47,034.14
"Amount of Winer's interest in the value of
   said good will,                         11,267.74
                                          _____

                                                              $58,301.88
                                                              _____

"Balance due G. B. Glenn as of January 16,
   1926,                                                           $  99.57"

Both sides excepted to this report, and all exceptions were overruled and the report confirmed, with the single exception as to the allowance of interest on the good will item credited to complainant. The Chancellor sustained the exception to this item and disallowed the item of interest thereon. He also adjudicated that the written contract with reference to the peas was altered by the meeting of the parties to this cause in the office of Mr. Foust, attorney for defendant; that plaintiff was not entitled to recover thereon and dismissed the amended bill in relation thereto. From this decree and all former decrees made at that term complainant prayed and perfected an appeal to this court. From so much of said decree as made an allowance to the complainant for the good will of the business the defendant excepted, prayed, was granted and perfected an appeal to this court. The errors assigned by the complainant are:

"(1) The court erred in holding that respondent G. B. Glenn was entitled to interest from July 1, 1918, on the $20,906.80 balance due from complainant, as shown in the report of the Master, because the delay constituting the period for which said interest was allowed was due to the refusal of respondents to recognize complainant's rights to an accounting as set forth in the original bill filed in October, 1918."

"(2) The court erred in disallowing the item of $3,602.94 —(The amount of interest as calculated and reported by the Master and as set out in final decrees differs from the amount stated by the court at the conclusion of said decree. The last figure—$3602.94—is a manifest error)—interest reported by the Master on the value of complainant's portion of the good will from July 1, 1918 until January 18, 1926.

"This was error because the good will was just as much a part of the accounting between the parties as any other item. It was an abuse of the court's discretion to refuse interest on the good will and at the same time to allow to respondent G. B. Glenn an interest item of over $9,000, on the amount which the report had shown complainant was due respondent Glenn on July 1, 1918. The court should have allowed interest on both items, or refused interest on both items."

"(3) The court erred in dismissing complainant's supplemental bill, and in holding that the terms of the written contract entered into between complainant and respondent had been altered or modified by a subsequent oral agreement."

The assignments by the defendants are:

"(1)  The court erred in holding that the good will of the Chattanooga Feed Company after the withdrawal of Winer was worth $7764.37 under the reference.

"The court should have held that Harry Winer took all the good will with him when he withdrew from the business, and entered into a competitive business under the facts as existed and hereinafter set forth."

"(2)  The court erred in the amount allowed for the good will, because the amount allowed was excessive."

Taking up the assignments of the defendants first: We do not think the concurrent finding of the Master and the Chancellor should be disturbed. The value of the good will was a fact to be ascertained from the evidence. It was therefore a matter properly to be referred to the Master to be found and reported. While the sum may not be capable of exact determination, any estimate resting partly in opinion must have been founded upon the evidence. It was the Master's finding, concurred in by the Chancellor. It would have been conclusive under rules heretofore in operation and, therefore, under a clause of section 12 of chapter 100 of the Acts of 1925, we are not authorized to disturb such a concurrence.

". . . Provided further: That where there has been a concurrent finding of the Master and Chancellor which under the principles now obtaining is binding on the appellate courts, the Court of Appeals shall not have the right to disturb such finding."

"When a Master's report is confirmed by the Chancellor on exceptions as to facts, such concurrence has the force and effect of the verdict of a jury and judgment thereon, and is conclusive on the Supreme Court." Gibson's Suits in Chancery, Sec. 620; Hicks v. Porter, 6 Pickle 1, (15 S. W., 1071); Fitzsimmons v. Johnson, 6 Pickle, 416, (17 S. W., 100); Dollman v. Collier, 8 Pickle, 660, (22 S. W. 741).

Certainly it would seem it was not intended that the courts should review a mass of testimony under the circumstances of such a concurrence without an assignment that there is no evidence to support it. It was the intention of the legislature to make this concurrent finding of the Master and Chancellor as to any fact conclusive, unless of course there should be no evidence to support it. The assignments made by the defendants are therefore overruled.

Regarding assignment No. 2 of the complainant, that the Chancellor was in error in disallowing the item of $3602.94 which the Master reported as interest on this good will from July 1, 1918 until Jan. 18, 1926, we do not think the same is well taken. This was a matter within the discretion of the Chancellor, and we do not think it appears that there has been any abuse of the same in its disallow-

ance. While as indicated upon assignment of defendants we did not review the evidence upon which the allowance for good will was made, upon this assignment, however, we have investigated it and are convinced that complainant is in no attitude to insist upon this as an equitable consideration, even if it be conceded that the Chancellor had authority to allow it. As stated complainant practically washed his hands of the business at a time when he had brought it a staggering loss that wiped out his interest had it been considered as his personal obligation, and in any event very materially impaired his ability to pay G. B. Glenn, to whose interest he succeeded, and who had his written obligation to pay the fixed sum that was due him, with interest, in any event. In the original contest complainant sought to have it declared that he was forced out of the business, which the decree of the court settled otherwise. We think it is evident that he could not have proceeded with it, or was lacking the credit to carry the peas on which the great loss had been sustained over into the next season. As appears from the former decrees complainant was not forced out, and could have stood upon his rights and have wound up the concern and had his status declared with the two women partners without regard to G. B. Glenn, who has retired, except that complainant's interest would of course have been incumbered with what he owed G. B. Glenn for the interest that was purchased. At any rate after some delay he filed this bill and was successful in setting aside his voluntary assumption of all losses, and in having the said losses adjusted upon the basis of his interest in the partnership, peas and all, which he succeeded in carrying over into the next season. Why, therefore, should he not have been required to carry out the terms of his purchase of Glenn's interest in the partnership, interest and all? Complainant thinks that the litigated right of an accounting should have excused the payment of interest to G. B. Glenn. The winding up of the partnership need not have delayed this settlement. Had complainant been in a position to have discharged his indebtedness to G. B. Glenn, he could have done so at any time and have stopped the accumulation of interest. This right, for this very purpose, was the subject of a clause in his contract of purchase from Glenn. This expedient if within the ability of the complainant seems never to have been thought of as a means of divorcing Glenn's pecuniary interest in the business from the difficulties in the way of its adjustment. The negotiations regarding the adjustment were conducted with G. B. Glenn, who only had a lien upon the assets for what was due him from the sale of his interest in the partnership, and defendant's difficulties, aside from these, were only with the women partners, whom Glenn seemed to represent because of their relationship. If complainant was able to have done this he should have so acted rather than invest his credit in a

competitive business, while his own interest and that of his associates needed his undivided attention and loyal support to retrieve security from the peril in which his improvidence had invested it. He was offered a chance to help work the concern out of its difficulties, conceding him an interest and a large salary, and with the proviso that when it was done the original purchase that he had made of G. B. Glenn's interest could be carried out. This he declined. He was generous enough in charging to himself the whole loss on the peas which wiped out his interest and left him indebted something the rise of twenty-three thousand dollars to the firm, as was supposed to be his intention, leaving its burdens and perils upon the shoulders of its remaining partners, the women relatives of the partner who had retired. The predicament of G. B. Glenn can readily be realized. The women were unwilling to submit their remaining interest in the firm to any further hazard under complainant's management. Evidently they could not conduct the business. G. B. Glenn under such circumstances could do nothing else than take charge of it and try to work it out of its difficulties, or apply for a receiver, foreclosing on his sale to complainant and winding up the business at once, which would no doubt have entailed a heavy loss on all, and more especially to the complainant. We do not think the results have been worked out inequitably to the complainant at all, and we think that each item of interest complained of should be considered upon its own merits. As an original proposition we think he has been allowed the full measure of value of the alleged good will, the enjoyment of which as an aid to working out the difficulties of the old firm was defeated by him in a very large measure, if not entirely, by the competitive business which he organized and conducted, absorbing its benefits. To have allowed interest under such circumstances we think would have been a gross perversion of judicial discretion.

We are satisfied also with the disposition the Chancellor has made in his decree as to the alleged sale of the peas in violation of the written agreement. It appears that a few sales were made not in exact conformity with the original agreement, but the Chancellor thought, and we concur in this, that such sales were justifiably considered as authorized by the interview had in attorney Foust's office, and complainant's insistence that something be done as the time had arrived for their disposition. Damages had been claimed also for several other alleged incidents of mismanagement, but as appears from the decree they had simmered down to the alleged sales in violation of the written agreement. We think, if such were made, authority therefor was rightfully thought to exist in response to complainant's urging, and that such sales cannot be avoided upon the technicality that he had not agreed in writing. His assent to the

price obtained and his authority to make the particular sales are all implied from his urging that it be done. Such sales as were complained of were made at the top of the market, and, while afterwards the market may have improved, it is not to be supposed that he could obtain a better price than that offered at the time the trade was closed. Upon his demurring after the peas were sold, defendant then threw up the job and complainant's brother was selected to dispose of the balance, and he closed deals without consulting Glenn. This was thought discourteous, but was not objected to, and no claim was made on the part of Glenn that the best prices were not obtained. We think under the circumstances that this claim of violation of contract was captious and without merit.

Upon the whole we are satisfied with the results reached by the Chancellor and his disposition of the matter. The assignments of error are all overruled and his decree affirmed, correcting, however, the apparent clerical error as to the interest disallowed, so as to make the judgment here conform to the correct figures resulting from the disallowance of the interest reported by the Master.

The costs of this court will be divided equally between the appellants and adjudged against them and their securities. The costs in the court below will remain as adjudged by the Chancellor.

Portrum and Thompson, JJ., concur.